IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ZELPRO ASSEMBLY SOLUTIONS, LLC, an Oregon limited liability company; CIRCUIT MANUFACTURING, INC., an Oregon corporation, and CALVIN RASMUSSEN, an individual,<br><br>                  Plaintiffs,<br><br>    v.<br><br>STINGL PRODUCTS, LLC, a Virginia limited liability company; DAVID STINGL, an individual; and TONY SIRIANNI, an individual,<br><br>                  Defendants,<br><br>NAC GROUP, INC., a Florida corporation.<br><br>                  Defendant-Intervenor. | Case No. 3:11-cv-00519-ST<br><br>FINDINGS AND RECOMMENDATION |

1 - FINDINGS AND RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

To collect a debt, plaintiffs Zelpro Assembly Solutions, LLC ("Zelpro"), and Calvin Rasmussen ("Rasmussen") filed this lawsuit on April 27, 2011, against defendants Stingl Products, LLC ("Stingl"), David Stingl and Tony Sirianni, alleging four claims for breach of contract, goods sold and delivered, account stated and fraud and misrepresentation. The debt arises from the alleged sale and delivery of swimming pool safety devices in 2009 from Circuit Manufacturing, Inc. ("Circuit") to Stingl worth $2,362,834.00, of which $1,903,720.04 remains unpaid. Plaintiffs later acquired Circuit's chose-in-action against defendants.

NAC Group, Inc. ("NAC"), a judgment creditor of Circuit, filed a Motion to Intervene (docket #15) in order to pursue counterclaims and crossclaims for fraudulent transfer and alter ego. NAC claims that plaintiffs obtained Circuit's chose-in-action against defendants through fraud, deceit, or conversion. Specifically, NAC alleges that plaintiffs engaged in a deceptive and fraudulent scheme to defeat NAC's claim against Circuit by allegedly transferring all of Circuit's assets through its principal, Rasmussen (an insider), to his newly formed company, Zelpro. On August 31, 2011, this court granted NAC's motion to intervene. Opinion and Order (docket # 30), adopting Findings and Recommendation (docket # 25).

On January 12, 2012, plaintiffs filed their Third Amended Complaint (docket # 60) which continues to allege claims for breach of contract (First Claim), goods sold and delivered (Second Claim), and account stated (Third Claim) against all defendants and fraud and misrepresentation (Fourth Claim) against individual defendants David Stingl and Toni Sirianni. NAC responded with a First Cross-Claim for Breach of Contract, alleging that it is the rightful owner of plaintiffs'

claims against Stingl to the extent necessary to satisfy a money judgment NAC obtained against Circuit in state court in February 2011.

Plaintiffs are corporate and individual citizens of Oregon. Third Amended Complaint ("Complaint"), ¶ 1. Stingl is a Virginia limited liability company whose members are citizens of Colorado, Florida, Maryland, New Jersey, New York, Virginia, and Washington D.C. Defendants' Answer (docket # 62), ¶ 1. David Stingl is a Virginia citizen, and Toni Sirianni is a Maryland citizen. *Id*. NAC is a Florida corporation. NAC's Answer (docket # 61), ¶ 15. The amount in controversy exceeds $75,000.00. Accordingly, this court has diversity jurisdiction under 28 USC § 1332.

Plaintiffs have filed a Motion for Partial Summary Judgment (docket # 63), seeking judgment against Stingl on the first three claims for breach of contract, goods sold and delivered, and account stated. Plaintiffs contend that Circuit manufactured and delivered switches to Stingl pursuant to two purchase orders dated November 5, 2008, and January 20, 2009. Stingl asserts that the two purchase orders were unilaterally generated by Circuit only for the purpose of trying to obtain wholesale price quotes for components. This court concludes that no genuine issue of material fact exists and that plaintiffs' motion should be GRANTED.

## LEGAL STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e).

The court must "not weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted). The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F3d 978, 984 (9th Cir 2007) (citation omitted).

## FACTS

### I. Prior to November 5, 2008

Stingl markets a safety vacuum release system which works by monitoring the vacuum on the suction side of the pool or spa pump and shutting off the pump if it detects a sudden rise in vacuum. Rasmussen Decl., ¶ 2. Because the system is protected by two patents, no person can make, use, sell, or offer to sell the system without Stingl's permission. DuBoff Decl., Exs. 1-4; 35 USC § 271.

Based on a Quotation, Stingl entered into an Assembly Contract with Circuit dated April 4, 2005, to manufacture and deliver 10,000 units that constitute the safety vacuum release system ("SR500 switches") for $176.55 each. Rasmussen Decl., ¶ 2; Sirianni Decl., ¶¶ 2, 3, Exs. A, B. In connection with that Assembly Contract, Stingl submitted a purchase order dated April 11, 2005. Sirianni Decl., ¶ 4, Ex. C. The manufacture of the SR500 switches required specialized

equipment and the procurement of parts from several suppliers. Rasmussen Decl., ¶ 4. Circuit fulfilled this contract.[1]

After June, 2006, Stingl placed various orders with Circuit for additional SR500 switches at a higher unit price due to the higher cost of obtaining components. Sirianni Decl., ¶ 6. Stingl also occasionally placed orders for modified versions of the switches, referred to as Spa/Pool Combinations, which were all timely shipped, reconciled, and paid in full. *Id*.

In early 2008, due to increased demand, Stingl began to receive more orders from its distributors and to order more SR500 switches from Circuit. *Id*, ¶ 7.[2] Rasmussen (on behalf of Circuit) and Sirianni (on behalf of Stingl) began to discuss ways of obtaining better component pricing in the future, including better pricing on a critical component called an NEC chip which serves as the central processing unit for a SR500 switch. Sirianni Decl., ¶ 8. Rasmussen suggested that Circuit may be able to obtain more favorable price quotes from its component suppliers by showing them hypothetical purchase orders. *Id*.

During 2008, Circuit continued to have difficulty obtaining sufficient components to consistently meet Stingl's orders, and Rasmussen represented to Sirianni that components were often not available at wholesale prices for Stingl's orders. *Id*, ¶ 9. Stingl was required to buy itself a component called an intermatic box, and Sirianni met with a representative of the supplier of the critical NEC chips to discuss pricing for that particular component. *Id*. During June and August 2008, Rasmussen and Sirianni continued to discuss component procurement and pricing.

---

[1] Circuit claims that it timely manufactured and shipped this initial order of 10,000 units in June 2005, whereas Stingl claims that due to Circuit's difficulty obtaining some of the components, Circuit did not fulfill this initial order until June 2006. Rasmussen Decl., ¶ 3; Sirianni Decl., ¶ 5. When that contract was completed is immaterial since Stingl's claims arise only from later orders and deliveries.

[2] The record does not contain any documentation of Stingl's orders between the 2005 Assembly Contract and the November 5, 2008 purchase order.

5 - FINDINGS AND RECOMMENDATION

*Id*, ¶ 10, Exs. D, E.  During 2008, Circuit made numerous intermittent shipments of various SR500 switches both to Stingl and its distributors under Stingl's outstanding orders.  *Id*, ¶ 11.

## II.     Disputed Purchase Orders

The parties disagree as to who generated two purchase orders and why.  The first purchase order is dated November 5, 2008, from Stingl to Circuit for 20,000 SR 500 switches at a unit price of $196.80.  *Id*, Ex. F.  Sirianni states that after his discussion with Rasmussen about component pricing, Circuit unilaterally generated and sent this purchase order to him.  Sirianni Decl., ¶ 12.  The purchase order specifically adds "(For NEC Chips)" to the description of the SR 500 switches because he and Rasmussen "had discussed that the document was to be used to obtain pricing on that component."  *Id*.  Sirianni asserts that he "did not initially sign or otherwise authorize any shipments of Switches under the November 5, 2008 purchase order," but later "did authorize shipments of Switches" pursuant to this purchase order.  *Id*.  Rasmussen, on the other hand, states that Stingl, not Circuit, placed this purchase order.  Rasmussen Decl., ¶ 5.

The second purchase order from Stingl to Circuit is dated January 20, 2009, for another 50,000 units at the same unit price of $196.80.  Sirianni Decl., Ex. G.  Once again, Sirianni states that Circuit unilaterally generated and sent this purchase order to him which he "never signed or authorized."  *Id*, ¶ 13.  Instead, he "expected that [Circuit] would use the January 20, 2009 purchased order to obtain price quotes from component suppliers to be considered in the event that Stingl were to place future additional orders for Switches, as Rasmussen and I had agreed."  *Id*.  Again, Rasmussen states that Stingl, not Circuit, placed this purchase order.  Rasmussen Decl., ¶ 5.

Circuit contracted with several suppliers to obtain the necessary components and began making and shipping 12,000 SR 500 switches to Stingl from May through November 2009. *Id*, ¶ 6. Stingl never rejected any switches delivered by Circuit. *Id*, ¶ 12. Stingl made intermittent lump sum payments to Circuit during 2009, but fell behind in its payments, causing Circuit to stop its manufacture and delivery after November 2009. *Id*, ¶¶ 7-8. According to Circuit's aged receivables, it shipped 12,000 switches to Stingl from May through November 2009 pursuant to invoices at $196.80 each, totaling $2,361,600. DuBoff Decl., Ex. 11. It also incurred $1,234 in storage costs, for a total amount of $2,362,834 now due and owing. *Id*; Rasmussen Decl., ¶ 9.[3]

Stingl concedes that it and its distributors received switches from Circuit until November 2009, but "did not expect that any of the Switches shipped up to this time were being shipped pursuant to the January 20, 2009 purchase order" which had not been authorized. Sirianni Decl., ¶ 14. Instead, Sirianni claims that he "did not know how many Switches remained to be shipped on Stingl's outstanding orders" because of difficulty reconciling those orders due to "delays in production caused by component shortages, the intermittent and inconsistent nature of [Circuit]'s shipments to Stingl, and because many shipments were made directly to Stingl's distributors." *Id*, ¶ 15. The parties exchanged a number of emails from December 2009 through November 2010 attempting to reconcile Stingl's orders with application of its payments to the invoices. McMullen Decl., ¶¶ 4-8, Exs. B-F. Despite repeated requests, Circuit has never provided Stingl with a complete set of packing slips showing the total numbers or destinations for all of Circuit's shipments of switches. *Id*, ¶ 9.

///

---

[3] Although Rasmussen refers to $1,224 in storage costs, that amount appears to be a typographical error based on the aged receivables calculation.

7 - FINDINGS AND RECOMMENDATION

### III.    Switches Held in Stingl's Warehouse

The parties also disagree as to how and why Stingl has switches stored in its warehouse. In early 2010, Sirianni asserts that Rasmussen asked him "if Stingl would be willing to temporarily hold [Circuit]'s excess inventory that [Circuit] did not have room to store." Sirianni Decl., ¶ 16. Sirianni agreed because he "believed that any excess Switches that [Circuit] may have built beyond those outstanding orders were unauthorized and would belong to [Circuit], not to Stingl, unless and until Stingl placed a valid order for the excess switches." *Id.* Circuit then shipped the switches to Stingl in two trailer loads which are currently being held in Stingl's warehouse. *Id*, ¶ 17. In March 2010, Rasmussen visited Stingl's warehouse and appeared to Sirianni to be taking an inventory of the switches. *Id*, ¶ 19. In August 2010, Sirianni asserts that he offered to return the excess switches in its warehouse to Circuit which Rasmussen refused. Sirianni Decl., ¶ 20; DuBoff Decl., Ex. 30. Instead, in September 2010, Rasmussen requested that Stingl sign a UCC Security Agreement that, in the event of Stingl's bankruptcy, would require the switches to be returned to Circuit, rather than go to Stingl's creditors. Sirianni Decl., ¶ 21, Ex. H.

Rasmussen, however, asserts that the switches in Stingl's warehouse were delivered to Stingl pursuant to the two purchase orders. Rasmussen Decl., ¶ 8. Accordingly, the switches in Stingl's warehouse are among those for which plaintiffs seek payment.

It is undisputed that on September 29, 2010, Sirianni signed a Security Agreement granting a security interest to Circuit in the "inventory it purchased from" Circuit to "secure the payment of $1,909.486.04 owed by [Stingl] to [Circuit]." *Id*, ¶ 23; DuBoff Decl., Ex. 13.

///

///

## **FINDINGS**

The issue is whether Stingl ordered or otherwise authorized shipment of the full number of switches for which plaintiffs seek payment.  This court concludes that the evidence is not sufficient to create a material fact dispute and that no reasonable factfinder could find in favor of Stingl.

**I.    Absence of Factual Dispute**

Although Stingl acknowledges the existence of the 2005 Assembly Contract and various orders of switches through 2008, it asserts that the two purchase orders dated November 5, 2008, and January 20, 2009, were intended to be used only to obtain price quotes for potential future orders, and that only the November 5, 2008 purchase order was ever later authorized.  According to Stingl, Circuit manufactured switches well over the amount for which it had actual orders.  This interpretation of the evidence is not plausible because it is contrary to the documentary evidence and assumes that Circuit was operating in a way that made little or no business sense, eventually driving it out of business.

It simply is unreasonable to conclude that the January 20, 2009 purchase order was to be used only to obtain additional price quotes and that Stingl never authorized shipment of units under that purchase order.  Two emails sent in June and August 2008 evidence a discussion between the parties regarding new component pricing in 2008.  Sirianna Decl., Exs. D & E.  However, the record is devoid of any other document around the time of the two disputed purchase orders or any time thereafter confirming or changing the unit price.  Stingl excuses this absence of evidence by noting that, for cost reasons, it has not yet engaged in any discovery concerning Circuit's communications with its suppliers.  Nonetheless, it is inconceivable that Stingl has no records or

emails that it exchanged with Circuit during the process of obtaining quotes. More importantly, Stingl does not explain why Circuit would issue two hypothetical purchase orders within three months of each other containing the same unit price in order to obtain quotes from its suppliers.

Moreover, an email dated March 25, 2009, from Circuit to Stingl reports the "good news" that Circuit "negotiated some better terms for the *next PO of 50000 units* . . . leading to some cost savings, better lead times and better terms." DuBoff Decl., Ex. 34 (emphasis added). The only reasonable interpretation of this statement is that the parties already had one operative purchase order for 50,000 units and that better terms would lead to another purchase order with a different unit price. Stingl argues that the reference to the prior purchase order could easily be the November 5, 2008 purchase order which he later "authorized." However, given the date and the reference to "50000," that interpretation is not reasonable. Instead, the reference is clearly to the most recent purchase order dated January 20, 2009, which specifies 50,000 units, and not the earlier November 5, 2008 purchase order for 20,000 units.

Stingl also points to the reference to "NEC chips" on the November 5, 2008 purchase order as being significant. However, that description is in parentheses. Since NEC chips were in all the switches, the need for this specific reference is, at best, unclear.

No correspondence, email or other documents supports Stingl's characterization of the November 5, 2008, and January 20, 2009 purchase orders. Although Sirianni claims that Circuit "unilaterally generated" them, they appear in all respects to be purchase orders generated by Stingl. In fact, they are identical in all respects to the initial April 11, 2005 purchase order from Stingl to Circuit. DuBoff Decl., Ex. 5. Stingl has not submitted any of its own purchase orders as a basis for comparison.

Despite the claim that Sirianni authorized shipments of Switches under the November 5, 2008 purchase order, Stingl has submitted no written evidence of such authorization. Although Sirianni frequently communicated by email with Circuit, there is no email containing such an authorization, which is highly suspect.

Stingl also asserts that it has merely been acting as bailee for an indeterminate number of switches on behalf of Circuit, relying on Sirianni's recollection of a conversation occurred in early 2010 with Rasmussen regarding Stingl's storage of Circuit's excess inventory. That assertion must be rejected for several reasons.

First, even if true, the switches at issue were all shipped and invoiced during 2009, *prior* to early 2010 when this alleged conversation regarding the alleged bailment took place. Instead, Sirianni likely is confusing the switches with the Intermatic boxes which Stingl had previously purchased from another vendor and delivered to Circuit for use in making the switches. By email dated April 30, 2010, Rasmussen advised Sirianni that Circuit had been storing intermatic boxes in two storage units about two blocks from its factory for which it had paid about $6,500 over the past year and told him that Stingl would have to pay the storage costs before the boxes would be released. DuBoff Decl., Ex. 15. In early May 2010, Stingl wired the storage payment to Circuit and scheduled to pick up the intermatic boxes by freight of about 30 pallets. *Id*, Exs. 16, 18. Circuit posits that, depending on how the pallets were loaded and their weight, this number of pallets would require either one or two trailers to ship. This would generally agree with Sirianni's recollection the units arrived in two trailer loads. Sirianni Decl., ¶ 17.

Second, three years of correspondence between the parties fails to even hint at a bailment. Instead, the correspondence reveals a consistent pattern of Circuit requesting payment and Stingl

11 - FINDINGS AND RECOMMENDATION

responding that it would soon make payments. According to Circuit's evidence, Stingl received 12 invoices between May 8 and November 3, 2009, each of which references either Purchase Order 2120 or Purchase Order 2142. DuBoff Decl., Exs. 8, 9. Each invoice states that payment is due within 30 days. Stingl never protested the invoices or claimed that it did not owe the amounts stated on them. Instead, it only questioned what payments should be applied to what invoices. *Id,* Exs. 19-29. Beginning in September 2010, the correspondence is dominated by stonewalling by Stingl. *Id,* Exs. 30-32. It is particularly noteworthy that Sirianni fails to state how many switches he alleges that Stingl ordered or how many switches are being stored pursuant to his alleged bailment arrangement.

    Second, due to the high cost of the components needed to manufacture the switches, Stingl's failure to make payment placed Circuit at a high risk of financial ruin. Shortly after the November 5, 2008 purchase order, Rasmussen sent Sirianni an e-mail describing the situation regarding the various suppliers of the components. DuBoff Decl., Ex. 33. In particular, he noted that the total material cost for about 3,600 switches was $456,000, that Circuit was falling behind in meeting the credit terms of its suppliers, and that it had maxed out on its line of credit of $150,000. *Id.* This clearly is not the kind of situation conducive to a company deciding to manufacture over 9,000 unauthorized switches. A few months later, on March 25, 2009, Rasmussen sent an e-mail to Sirianni specifically describing how the lack of payment by Stingl was affecting its ability to obtain parts from suppliers. *Id*, Ex. 34. Rasmussen explicitly asked when Stingl would be sending the next check and also updated Stingl on the negotiations regarding prices for parts for the next purchase order of 50,000 units. *Id.* The e-mail ended by asking whether Stingl still wanted the switches shipped daily or preferred them to be placed on pallets and

shipped weekly. *Id*. On March 31, 2009, Stingl responded that it wanted the switches to be put on pallets and shipped weekly. *Id.* On November 11, 2009, Rasmussen sent another e-mail to Sirianni detailing almost $1 million that Circuit owed to its suppliers and stating that it was facing collections. *Id,* Ex. 35. He explicitly stated that Stingl owed Circuit about $2.5 million and requested a payment schedule. *Id*. At this point in time, all the switches at issue had been shipped to Stingl. Notably, on December 6, 2010, Rasmussen sent Sirianni an e-mail stating that Circuit had begun liquidating its inventory of Stingl switches, mostly at scrap value. *Id*, Ex. 32. Such a liquidation is hardly consistent with Sirianni's claim that Stingl was acting as a bailee on behalf of Circuit.

Third, the switches are protected by U.S. patents and cannot lawfully be used unless authorized by Stingl which is the only reasonably possible customer. A jury could not reasonably find that Circuit engaged in massive unauthorized manufacturing or that it sent the switches to Stingl for the purpose of bailment because Circuit could not sell the switches to other parties without risking liability for patent infringement.

Finally, the Security Agreement executed by Sirianni on behalf of Stingl is completely inconsistent with a bailment arrangement. It explicitly recites that Stingl had purchased the switches from Circuit and further required Stingl to insure the switches and to not remove them except in the ordinary course of business. *Id,* Ex. 13. The e-mails surrounding the execution of the Security Agreement show that it was obtained in lieu of immediate litigation. *Id,* Ex. 36. Sirianni's self-serving statement must be rejected since his failure to read an agreement or understand its terms do not excuse compliance with its conditions. *Franklin v. Western Pac. Ins. Co.,* 243 Or 448, 452-53, 414 P2d 343, 346 (1966).

13 - FINDINGS AND RECOMMENDATION

In sum, Sirianni's Declaration is inconsistent with all the documentary evidence submitted by the parties and, as a result, may be disregarded. An issue is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 US 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id* at 252. When the party opposing summary judgment fails to produce any significant evidence, and overwhelming evidence favors the moving party, it may be unreasonable to draw an inference contrary to the moving parties' interpretation of the facts. In such cases, summary judgment is appropriate. *United States v. 1980 Red Ferrari,* 827 F2d 477, 479-80 (9th Cir 1987).

## II.     Breach of Contract (First Claim)

A breach of contract requires proof as to: (1) the existence of a contract, (2) its relevant terms, (3) plaintiffs full performance and lack of breach, and (4) defendant's breach resulting in damage to plaintiff. *Fleming v. Kids and Kin Head Start,* 71 Or App 718, 721, 693 P2d 1363, 1364 (1985).

It is undisputed that Circuit and Stingl had a business relationship dating back to 2005 under which Stingl placed orders on an ongoing basis with Circuit. According to the purchase orders and invoices, Circuit agreed to manufacture switches for which Stingl would pay the agreed-upon price to Circuit. Between May and November 2009, Circuit shipped 12,000 switches to Stingl, for a total contract price of $2,361,600. Stingl admits paying only $459,113.96. Answer, ¶ 15. Thus, Stingl has breached the contract reflected by the November 5, 2008, and January 20, 2009 purchase orders and related invoices by not paying the

outstanding balance of $1,902,486.04 (excluding storage costs for which the record contains no documentation).

Pursuant to ORS 72.6010, under certain conditions a buyer may: (1) reject the whole; (2) accept the whole; or (3) accept any commercial unit or units and reject the remainder. If the buyer wishes to make a rightful rejection, it must reject the goods within a reasonable time after their delivery. ORS 72.6020. A rejection is ineffective unless the buyer seasonably notifies the seller. *Id.* During and after 2009, Stingl never rejected the switches delivered by Circuit. Rasmussen Decl., ¶ 12. Furthermore, Stingl continued to make payments to Circuit as late as January 2010 for switches delivered through November 2009. By failing to inspect and give notice of rejection for 15-22 months, Stingl accepted the switches. ORS 72.6060. By accepting the switches, Stingl must pay Circuit at the contract rate for the remaining unpaid switches. ORS 72.6070. Therefore, Stingl is liable in the amount of $1,902,486.04, plus prejudgment interest.

### III.    Goods Sold and Delivered (Second Claim)

A claim for goods sold and delivered requires the plaintiff to prove: (1) that the defendant requested it to deliver certain goods; (2) that it delivered the goods; (3) the agreed or reasonable value of the goods; and (4) that defendant did not pay. *Crosby Paint Corp. v. Bi-Mart Co.,* 81 Or App 341, 345, 724 P2d 937, 939, *review denied*, 302 Or 194, 727 P2d 977 (1986).

Stingl requested Circuit to deliver the SR500 switches. Stingl agrees that the switches were delivered and that it possesses them. DuBoff Decl., Ex. 7 (Interrogatory No. 4). The agreed price was set forth in the November 5, 2008, and January 20, 2009 purchase orders and invoices at $196.80 per unit. *Id,* Exs. 7 & 8. This price was reasonable in light of the former price and the lack of objection by Stingl. Stingl has not paid the agreed or reasonable price.

Therefore, plaintiffs are entitled to recover pursuant on their claim for goods sold and delivered for the outstanding balance of the switches of $1,902,486.04, plus prejudgment interest thereon.

### IV.     Account Stated (Third Claim)

An account stated claim requires an agreement between the parties that a certain amount is owing and will be paid.  *Crosby Paint,* 81 Or App at 346, 724 P2d at 940.   A plaintiff need not prove that there was an underlying agreement, but rather must prove that "the parties had agreed at some point that the balance that defendant allegedly owed was correct."  *Id* (citation omitted).

Here it is undisputed regarding the amount of the unpaid balance or the value of the switches.   In fact, Stingl acknowledged in the September 2010 Security Agreement that it owed $1,909,486.04 to Circuit.   Rasmussen Decl., ¶ 9; DuBoff Decl., Ex. 13.   This amount exceeds the amount due for the switches and, thus, includes an estimate of the storage costs due.   Based on the documentation in the record, the current unpaid balance, including storage costs, is $1,903.720.04 which plaintiffs are entitled to recover from Stingl as an account stated.

### RECOMMENDATION

For the reasons set forth above, this court recommends that plaintiffs' Motion for Partial Summary Judgment (docket # 63) be GRANTED.

### SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.   Objections, if any, are due October 29, 2012.   If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

///

///

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 10th day of October, 2012.

>s/ Janice M. Stewart_____
>Janice M. Stewart
>United States Magistrate Judge

17 - FINDINGS AND RECOMMENDATION